[No. D014440. Fourth Dist., Div. One. Apr. 12, 1993.]

EDWARD C. ALLRED, Plaintiff and Respondent, v.
WILLIAM L. HARRIS et al., Defendants and Appellants.

**COUNSEL**

Boudreau, Trentacosta & Matuk, Boudreau & Trentacosta, Steven M. Boudreau, Gregory Jon Anthony and David L. Llewellyn, Jr., for Defendants and Appellants.

Ronald Talmo for Plaintiff and Respondent.

**OPINION**

**KREMER, P. J.**—William L. Harris and individuals associated with Concerned Citizens for Human Life and Shield of Roses (hereafter sometimes

collectively referred to as Harris) appeal the issuance of a permanent injunction prohibiting anti-abortion picketing in the parking lot, interior walkways and grass areas of the Fletcher Parkway Medical Center (hereafter Medical Center). We conclude the injunction was properly issued and therefore affirm.

## FACTS

The Medical Center has 19 tenants and 3 vacant suites. Among the tenants are a general surgery center, radiology, eye care, orthopedics, adolescent substance abuse counseling, hand and arm rehabilitation, obstetrics and gynecology, dermatology, dentistry and psychiatry. Family Planning Associates is located in a suite on the second floor of the Medical Center. Family Planning Associates perform abortions, sterilizations, birth control, pregnancy testing and sonograms.

The Medical Center has two parking lots. There are 56 parking spaces on the east side of the building and over 200 on the west side. There are six "Patient Parking Only" signs posted throughout the parking areas. There are also "No Trespassing" signs posted in the parking areas. The parking lots are used by the Medical Center tenants, patients and other users of the building. The parking lot is not open to the public generally. There are no public sidewalks or parks adjacent to the Medical Center.

The appellants protested in the parking areas on Saturdays. Some of the appellants first approached people as they were driving into the lot and then as they exited their cars, walked towards the entrance of the Medical Center and entered. The appellants attempted to distribute literature to the people entering and using the parking lot. Other of the appellants, particularly the Concerned Citizens for Human Life and the Shield of Roses, walked in a circle in the parking areas while saying the rosary. Sometimes, the person leading this group would use a voice amplifier.

In July 1989, the landlord gave Allred written permission to take "any and all actions necessary or advisable" to provide adequate security for the premises. In October 1989, Allred filed a complaint for injunctive relief against the appellants.

Allred proceeded on a property rights theory, arguing he was entitled to an injunction based on the private property nature of the Medical Center's parking lots and walkways. He argued Harris and the other defendants were trespassers on that private property and could be excluded by an injunction. Allred did not dispute the value of Harris's anti-abortion picketing activity to

potential patients of the clinic or claim an injunction was proper based on the disruptive behavior of the protesters. Allred made a motion for a nonsuit on the basis an injunction was appropriate because Harris and the others were trespassing on private property.

The trial judge denied the motion for a nonsuit, explaining that while he had no doubt Allred had made a prima facie case in trespass, the judge also had "not a doubt in [his] mind that [the defendants had] an affirmative defense which is the constitutional defense raised by *Pruneyard*[1] and other . . . cases."

The trial court issued a detailed statement of decision, concluding, among other things, that Harris and the other defendants provided important information and counseling to women seeking an abortion which Allred failed to provide, and that the "defendants do not have alternative effective other channels of communication to contact the users of the abortion facility, since there are no public sidewalks or parks adjacent to the [Medical Center]."[2] The court, however, ultimately found the Medical Center parking lot and interior walkways were not generally open to the public and, after reviewing numerous cases from other jurisdictions, concluded the defendants did not have a right to picket on the private property of the Medical Center.

The court granted the injunction and prohibited the appellants "and any other person acting in concert or participation with them, who have actual notice" of the judgment from, "entering onto any portion of the private property [of the Medical Center], specifically including, but not limited to, the private parking [lot] to the Building, and the interior walkways and grass areas on the property, in order to:

"1. Demonstrate, picket, or conduct any expressive activities regarding whether to continue or end a pregnancy.

---

[1]*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341].

[2]We note that many of the court's findings about the value of Harris's anti-abortion picketing, the lack of counseling provided by the clinic and that the clinic fell below the standard of care in the local community for failure to obtain "informed consent" from its patients because the clinic failed to provide counseling on whether or not a woman should obtain an abortion, were findings irrelevant to the issue before the court, i.e., whether Allred could exclude Harris and the others from trespassing on the private property of the Medical Center. Because Allred defended solely on a property rights basis, he did not, for example, present evidence on the standard of care and informed consent issues. We further note the court's finding Harris had no alternative means of communication because of the lack of public sidewalks or parks adjacent to the Medical Center is not supported by the evidence. Photographs of the Medical Center and nearby street show dirt sidewalk areas adjacent to the public street and to the Medical Center driveway and not far from the area where the individuals picketed in the parking lot.

"2. Physically approach, confront, walk nearby, or follow any patient, prospective patient, persons accompanying a patient or prospective patient, employee, or invitee of Plaintiff.

"3. Distribute, broadcast or communicate in any manner, any information, in written or oral form, specifically including, but not limited to, pamphlets and leaflets, regarding whether to continue or end pregnancy."

DISCUSSION

I

*Picketing on Private Property*

As a general rule, landowners and tenants have a right to exclude persons from trespassing on private property; the right to exclude persons is a fundamental aspect of private property ownership. (See *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 435 [73 L.Ed.2d 868, 882, 102 S.Ct. 3164].) An injunction is an appropriate remedy for a continuing trespass. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 605, pp. 704-705.)[3]

The right to exclude persons exercising First Amendment rights, however, is not absolute. Our Supreme Court held in *Robins* v. *Pruneyard Shopping Center* (*Pruneyard*), *supra*, 23 Cal.3d 899, that when private property is generally open to the public and functions as the equivalent of a traditional public forum, then the California Constitution protected speech, reasonably exercised, on the property, even though the property was privately owned. In *Pruneyard*, the property involved was a large regional shopping center. The plaintiffs were students who were denied access to the shopping center to solicit signatures on petitions opposing a United Nations resolution. The plaintiffs sought an injunction to injoin the shopping center from denying them access to collect signatures for their petition. The Supreme Court held the plaintiffs were entitled to access.

The Supreme Court reasoned large retail shopping centers were the suburbs' functional equivalent to the traditional town center business block

---

[3]Harris argues Allred had no standing to seek an injunction because he was but one of many tenants in the building. This contention is without merit. Allred, as a tenant, had a possessory interest in the parking lot and walkways, had the landlord's specific authorization to take steps necessary for the security of the parking areas and was affected by the defendants' activities which were aimed at disrupting his normal business activities. (See *Planned Parenthood Shasta-Diablo, Inc.* v. *Williams* (1993) 12 Cal.App.4th 1817, 1823 [16 Cal.Rptr.2d 540].)

where First Amendment activities have historically been exercised and "scrupulously" guarded. (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, 908-910.) The court noted large regional shopping centers are open to the general public, drew large numbers of people and had a largely "public character." (*Id.* at pp. 910-911 and fn. 5.) The court emphasized it was not considering " 'the property or privacy rights of an individual home-owner or the proprietor of a modest retail establishment.' " (*Id.* at p. 910.)

The question then is whether the Medical Center parking lots and interior walkways function as a public forum like the large regional shopping center in *Pruneyard* or whether the Medical Center is functionally equivalent to a modest retail establishment which is not compelled to allow access to individuals for First Amendment purposes. We recently addressed this issue in *Planned Parenthood* v. *Wilson* (1991) 234 Cal.App.3d 1662, 1668 [286 Cal.Rptr. 427] (*Wilson*), and concluded the private parking areas of a medical facility were not the equivalent of a traditional public forum and therefore individuals did not have a constitutional right of access to the property for the purpose of First Amendment activity. Another court has also reached the same conclusion. (*Allred* v. *Shawley* (1991) 232 Cal.App.3d 1489 [284 Cal.Rptr. 140].)

In *Wilson,* we observed: "The Medical Center's . . . tenants exclusively offer professional and personal services to specific clientele. It is for use only by individuals with specific business purposes, such as employees, clients and prospective clients of the tenants. The . . . off-street parking lot is designed to provide a convenient place to park for those having direct business with Medical Center tenants. Each parking spot is labeled for use by 'tenants' and 'patients,' and there is no space for public parking in general. Unlike a large shopping mall or historically recognized public forums like parks, streets or public sidewalks, the Medical Center in no way has acquired the attributes of a public forum. Indeed, both architecturally and by usage, '[i]t presents no significant opportunity to disseminate ideas, and prohibiting such activity on its premises does not curtail the realistic opportunity of citizens to exercise their right of free speech. The center [is] not the functional equivalent of a public place. . . .' [Citation.] Unlike the 21-acre shopping center containing 65 shops, 10 restaurants and a cinema in *Robins,* the Medical Center here with its parking lot resembles a 'modest retail establishment' providing professional and personal services to specific clientele. Although members of the public are invited to avail themselves of the particular services performed by specific tenants providing medical services, they are not invited to congregate, relax, visit, seek out entertainment, browse and shop for personal, household or general business merchandise." (*Planned Parenthood* v. *Wilson, supra,* 234 Cal.App.3d 1662, 1671-1672; see also *Allred* v. *Shawley, supra,* 232 Cal.App.3d 1489, 1501-1502.)

Here, also the Medical Center's property is private in character and lacks the attributes of a public forum. The Medical Center does not provide a place for the general public to congregate but provides services to a specific clientele and is used for specific business purposes by employees, clients and the tenants' prospective clients. The parking lot is not generally open to the public but is intended for the use of people with direct business with the Medical Center as indicated by the "Patient Parking Only" and "No Trespassing" signs. The Medical Center has more in common with a small retail establishment than a large regional shopping center and thus is not constitutionally compelled to allow access to its private property for First Amendment purposes.

Harris argues the anti-abortion picketers here are entitled to access pursuant to the Supreme Court's holding in *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561]. In *Lane*, decided 10 years before the Supreme Court's decision in *Pruneyard, supra*, 23 Cal.3d 899, union picketers involved in a labor dispute were trying to distribute handbills urging customers not to patronize a large "super-market-type" grocery store which was fronted by a large parking lot extending 150 feet to the public street. Store customers entered and left the market along a private sidewalk adjacent to the building. The Supreme Court held the picketers were entitled to picket along the private sidewalk adjacent to the market, noting that a prohibition against picketing on the private sidewalk would create a "cordon sanitaire" around the business establishment in light of the parking lot buffer between the public street and store entrance which would effectively immunize the market from any on-the-spot criticism. (*In re Lane, supra*, 71 Cal.2d 872, 876-877.)

Division Three of this district has recently considered *Lane* in the context of private clinic picketing and found *Lane* inapplicable. In *Allred* v. *Shawley, supra*, 232 Cal.App.3d 1489 the court stated:

"Appellants rely heavily on *In re Lane*. However, ours is a different situation. Far from being a retail store, which holds out an invitation to the entire buying public in general, the professional center serviced mainly prearranged clientele. It was not fully open to the local community; nor did it provide services which were essential to all community members, such as in the mall of *Schwartz-Torrance* of the 'large "super-market-type" grocery store' in *Lane*. [Fn. omitted.] Retail sales were specifically forbidden on the premises. [The medical clinic] and the professional center in general are at the opposite end of the continuum from *Schwartz-Torrance* and command a different result because ' "[t]he [*less*] an owner, for his advantage, opens up his property for use by the public in general, the [*less*] do his rights become

circumscribed by the statutory and constitutional rights of those who use it." [Citation.]' *(Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766, 771.)" *(Allred* v. *Shawley, supra,* 232 Cal.App.3d 1489, 1501-1502.)

Similarly, in *Planned Parenthood* v. *Wilson, supra,* 234 Cal.App.3d 1662, 1674, footnote 9, we found cases involving expressive activities at a shopping center and at Union Station in Los Angeles inapplicable to picketing of a private medical clinic. In this context, we consider *Lane* a preshadowing of the *Pruneyard* decision 10 years later and not a case holding that any private business locale even partially open to the public becomes a public forum for expressive activities related to the business conducted there. Under the facts of this case as framed by the parties, the issue resolves to whether the private medical clinic here is more closely akin to the regional shopping center of *Pruneyard* or the modest retail establishment excepted in that decision. We do not believe the trial court erred when it drew the line to favor the clinic.

We conclude neither the California Constitution nor the *Pruneyard* and *Lane* cases require the Medical Center to allow Harris and the others access to the private property of the Medical Center for expressive purposes. The court properly granted Allred an injunction.

## II

### Content Regulation of Speech

Harris contends the injunction violates the constitutional guarantee against content-based restrictions on freedom of expression since the injunction enjoins only expression on the topic of "whether to continue or end a pregnancy." This is not an impermissible content-based restriction; rather, it reflects the court's attempt to narrowly define the activity and persons affected by the injunction. Injunctions affecting First Amendment activity should be narrowly tailored. *(Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 81 [160 Cal.Rptr. 745, 603 P.2d 1341].)

### DISPOSITION

The judgment is affirmed.

Work, J., and Huffman, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 1, 1993.